# UNITED STATES  DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**HENRY HARPER**                                      **CIVIL ACTION**

**versus**                                                    **NO. 09-223**

**WARDEN  DOUZAT**                              **SECTION: "D" (6)**

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary,[1] and submission of proposed findings and recommendations for disposition pursuant to Title 28, United States Code, Sections 636(b)(1)(B) and (C), and, as applicable, Rule 8(b) of the Rules Governing Section 2254 cases.  Upon review of the entire record,

---

[1] Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

the court has determined that this matter can be disposed of without an evidentiary hearing.  For the following reasons, it is hereby recommended that the instant petition be **DENIED WITH PREJUDICE**.

## PROCEDURAL BACKGROUND

Petitioner, Henry Harper, is a state prisoner incarcerated at the Tensas Detention Center, Waterproof, Louisiana.  Harper was originally charged with one count of aggravated rape and one count of aggravated kidnapping, violations of La.R.S. 14:42 and 14:44(1), respectively.  The State reduced the charge on count two to simple kidnapping and after a trial by jury on January 19, 2006, Harper was convicted of simple kidnapping.[2] For reasons not discernible from the record, it appears that the aggravated rape charge was not prosecuted. Thereafter, the state filed a habitual offender bill of information and the court adjudicated Harper to be a third felony offender.[3] He was sentenced, on January 28, 2006, as a habitual offender,  to a term of seven (7) years hard labor, without benefit of parole, probation or suspension of sentence.[4]

---

[2]See State Rec. vol. 2 of 2 at p. 559.

[3]See State Rec. vol. 1 of 2 at p. 158 for a copy of habitual offender minute entry.

[4]See State Rec. vol. 1 of 2 at p. 158.

On September 5, 2007, the Louisiana First Circuit Court of Appeal affirmed his conviction.[5]  The Louisiana Supreme Court denied his related writ application on February 15, 2008, thus making his state conviction final.[6]  Harper filed no applications for post-conviction relief in the state court but instead filed a petition for writ of habeas corpus in the U.S. District Court for the Middle District of Louisiana.  The case was transferred to this court and a response to the petition was ordered to be filed by the State.

In its response, the State concedes that Harper's federal habeas application is timely filed and that the claims raised therein have been exhausted in the state courts.[7]  The claims raised by petitioner are: insufficiency of the evidence relative to simple kidnapping, and that the trial court erred in allowing the admission into evidence of the written statements of witnesses Jammie Smith and Toyomi Johnson. The State urges this court to deny each claim on the merits. Each of petitioner's claims will be addressed, in turn.

---

[5] *State v. Harper,* 970 So.2d 592 (La. App. 1st Cir. Sept. 5, 2007)(No. 07-KA-0299).

[6] *State v. Harper*, 976 So.2d 173 (La. 2008) (No. 2007-K-1921).

[7] See Fed. Doc. No. 10 at p. 7 of the State's Response.

## STATEMENT OF FACTS[8]

The following facts are derived from the opinion of the Louisiana First Circuit Court of Appeal on direct review of petitioner's conviction:

> On Valentine's Day 2004, the defendant met Denneshel Valerie ("Denneshel"). Shortly thereafter, Denneshel moved in with the defendant and his two children from a previous relationship. In August 2004, the couple moved to an apartment on Payne Street in Houma, Louisiana. The victim, S.M.,[9] also lived on Payne Street (in a trailer down the street). On October 22, 2004, only eight months after they met, Denneshel and the defendant had a daughter, Henrishell Harper. Henrishell was confined to the hospital because she was born prematurely and needed constant care. In order to be closer to the hospital, Denneshel decided to move to Marrero with her parents. The defendant's children stayed with him.
>
> Shortly after Denneshel left, S.M. and her two children moved in with the defendant and his children. S.M. lived with the defendant until December 2004, when Denneshel returned to Houma after her baby was released from the hospital. S.M. moved back into her trailer on Payne Street, and Denneshel moved back in with the defendant. Despite having reconciled with Denneshel, the defendant did not discontinue his relationship with S.M. Denneshel was aware of the continued relationship and did not have a problem with it. Denneshel never questioned the defendant as to why he was still seeing S.M.

---

[8]The facts are adopted from the state appellate opinion in *State v. Harper*, 970 So.2d 592 (La.App. 1st Cir. 2007), after a thorough review of the record, including the trial transcripts.

[9]In accordance with La. R.S. 46:1844(W), the opinion referenced the victim only by her initials.

On January 22, 2005, while S.M. and the defendant were helping S.M.'s mother move, Denneshel called the defendant on his cellular telephone. S.M. became upset, and a verbal altercation ensued. S.M. began to question the defendant as to why Denneshel was calling him and whether he was going to leave to be with her. The defendant left S.M. at her mother's residence and walked back to Payne Street because he did not "want to hear all that."

Later that evening, Joyce Kimber ("Kimber") visited S.M.'s mother's house. Kimber lived next door to the defendant. S.M. went home with Kimber to retrieve her children she had left there. While she was at Kimber's home, S.M. received several phone calls and text messages from the defendant. According to S.M., the defendant was upset because she told him that she did not want to continue their relationship. During one of the calls, the defendant told S.M., "Oh, if I catch you I'm going to blues you. Bitch, you better not step outside, whore, I'm going to get you." S.M. explained that by "blues you," the defendant meant he would do anything possible to her. The defendant also sent S.M. a text message that read, "YEA IF THAT'S INCLUDING YOU. BESIDES IF I HAD EVERYTHING I WOULDN'T BE OUT HERE WAITING 4 YOU GOOD OR BAD HOPN IT WORK OUT SO I DON'T HAVE 2 KILL NOBODY AS SWEET AS YOU. LUV ME."

A little while later, after Kimber left the residence, the defendant entered and approached S.M. as she stood in the kitchen talking to Darnell Sneeze, her distant cousin. The events that transpired once the defendant approached S.M. inside Kimber's residence were disputed at trial. S.M. claimed the defendant told her, "[w]hore, say what you

were saying. Say what you got to say now, whore."
According to S.M., the defendant had his hand in his
pocket, but she could see the imprint of a knife inside. The
defendant repeatedly threatened to "blues" S.M. S.M
explained that upon observing the "mean, devilish" look in
the defendant's eyes, she realized that he was not joking.
According to S.M., Darnell Sneeze witnessed the
encounter, but did not attempt to intervene.

Fearful, S.M.'s focus turned to trying to get away from the
defendant. As she walked away from him and towards the
bathroom, she told the defendant that she needed to go and
give her child a bath. He followed S.M. and the child into
the bathroom. Jammie Smith, Kimber's eleven-year-old
niece, was inside the bathroom taking a shower. As Jammie
peeked her head out of the shower curtain, the defendant
pulled out the knife, put it to S.M.'s throat and threatened,
"[b]itch, you got five seconds to get the f* * * out of this
bathroom or your blood will be all over this m* * * * * f*
* * * *. Bitch, I'm going to stab you 15 times." Toyomi
Johnson, another of Kimber's nieces, was also present in the
house. She walked by the bathroom to see what was going
on. The defendant then grabbed S.M. by her ponytail, held
the knife to her neck, and forced her to walk outside. S.M.
explained that as they walked out of the house, she feared
that her "life was over."

The defendant brought S.M. to an area towards the rear of
the house. Still armed with the knife, he continued to
threaten S.M. He told her, "...I might as well do what ... I
got to do to you now because you still going to tell me you
don't want me no more after this...." After he realized that
there were people passing on the street, the defendant
decided to relocate to S.M.'s trailer. The defendant placed

the knife in his pocket and demanded that S.M. walk close to him.

Meanwhile, Darnell Sneeze called Iris Smith (Jammie Smith's mother) over to Kimber's residence. Based upon information she received from Jammie, Toyomi, and Darnell Sneeze, Iris Smith called 911.

Once the defendant and S.M. arrived at S.M.'s trailer, the defendant forced S.M. towards the bedroom. He ordered her to get into the bed and refused to allow her to turn on any of the lights. The defendant again threatened to "blues" and "stab" S.M. while asking why she did not want him anymore.

The defendant's version of the events differed substantially. Although he admitted to becoming involved in a verbal altercation with S.M. after Denneshel called him, the defendant denied ever threatening or physically abusing S.M. on the night in question. He denied having a knife and/or forcing S.M. to go anywhere with him. The defendant claimed he went to Kimber's residence, only because S.M. called him and they "made up." He testified that when he approached S.M. in the kitchen, he simply asked her was she still mad at him. He claimed S.M. then voluntarily left Kimber's house with him to go outside. After being outside for a while, he and S.M. decided to go to S.M.'s trailer because she was cold outside despite having been given the defendant's jacket to keep warm. The defendant claimed he did not recall ever sending S.M. the threatening text message.

In response to Iris Smith's call to 911, Officer Neil Abbott, III, of the Houma Police Department was dispatched to the area. Upon arriving at Kimber's residence, Abbott made contact with Jammie and Toyomi, who advised him of what

they witnessed between the defendant and S.M. The girls also provided a description of the knife that was used by the defendant. Abbott immediately proceeded to S.M.'s trailer where he and several other officers knocked on the door and announced their presence. There was no response. Based upon the information they received and the fact that they heard movement inside the trailer, the officers made a forced entry into the residence. S.M. hysterically told the officers "nothing happened." S.M. was escorted out of the residence, and the defendant was arrested. As she was leaving the residence, S.M. kept looking back towards the defendant and continuously and spontaneously repeated, "Nothing happened."

While the officers were subduing the defendant, S.M. walked away from the scene and did not return. At trial, S.M. explained that before the police entered the trailer, the defendant told her to tell the police that he did not do anything to her. She further explained that she complied with the defendant's instructions to tell the officers that nothing happened because she was afraid of what he would do to her. She explained that when she left the scene, she hid in a field on Payne Street. She was afraid to fully disclose the events that transpired that night.

When he initially made contact with Jammie and Toyomi, Officer Abbott provided blank witness-statement forms for them to record their statements. He instructed them to bring the statements to the police department once they were completed. Iris Smith later turned over two handwritten statements indicating that the defendant entered Kimber's residence, placed a knife to S.M.'s throat, and stated that he would cut her fifteen times if she did not go with him. One statement was signed by Jammie Smith, the other by Toyomi Johnson.

## STANDARD OF REVIEW

This habeas proceeding is subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, because Harper filed his federal petition (in the U.S. District Court, Middle District of Louisiana) on September 8, 2008, well after AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 335–36 (1997). "Under AEDPA, if a state court has adjudicated a habeas petitioner's claims on the merits, he may receive relief in the federal courts only where the state court decision 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007) (quoting 28 U.S.C. § 2254(d)).

"A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 404–08, 120 S. Ct. 1495 (2000)). To

merit habeas relief, a state habeas court's application of federal law must be not only incorrect but "objectively unreasonable." *Renico v. Lett*, –U.S. –, 130 S. Ct. 1855, 1865, 176 L.Ed.2d 678 (2010). A state court's factual findings are "presumed to be correct," although a habeas petitioner may rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## MERITS

### Insufficiency of the Evidence: Simple Kidnapping

Petitioner claims that the State never proved beyond a reasonable doubt all of the essential elements of simple kidnapping. More specifically, petitioner complains that the State did not produce a single witness to corroborate the victim's accusation that she was the victim of an abduction.[10]

The Supreme Court established the due process standard a reviewing court must utilize in analyzing the sufficiency of the evidence in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Pursuant to *Jackson*, the inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime, as identified by state substantive law, to have been proven beyond a reasonable doubt. *Id.* at

---

[10]Rec. Doc. 1 at p. 12.

316-17, 99 S.Ct. at 2787.  In a federal habeas corpus proceeding, great deference must be given to the factual findings in the state court proceedings such that the reviewing court must defer to the jury's resolution of credibility determinations and the justifiable inferences of fact that can be drawn from these determinations  *Knox v. Butler*, 884 F.2d 849, 851 (5th Cir. 1989).  Further, the habeas corpus statute obliges federal judges to respect credibility determinations made by the trier of fact. *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 637, 126 L.Ed.2d 596 (1993), *citing Summer v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982). A claim of insufficiency of the evidence is a mixed question of law and fact, requiring this Court to examine whether the state court's denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.  *Penry v. Johnson*, 215 F.3d 504, 507 (5th Cir. 2000); *Maes v. Thomas***,** 46 F.3d 979, 988 (10th Cir. 1995).

The state appellate court, applying the *Jackson v. Virginia* standard, thoroughly addressed petitioner's claim in a lengthy discussion of both federal and state law. The court denied relief after providing the following analysis:

> Louisiana Revised Statute 14:45(A)(1) defines simple kidnapping, in pertinent part, as the intentional and forcible seizing and carrying of any person from one place to another without his consent.

Initially, we note that the defendant does not claim that, if believed, the victim's testimony was insufficient to establish the elements of the offense. Instead, he challenges the jury's decision to believe the victim's story, attacking her testimony as being incredible, inconsistent, and contradicted by the testimony of other State and defense witnesses.

The verdict in this case reflects that, after considering the credibility of the witnesses and weighing the evidence, the jury accepted the testimony of the victim and rejected the testimony of the other witnesses. In reaching its decision, the jury had before it, and presumably considered, all of the evidence that the defendant claims rendered the victim's testimony unbelievable. After hearing the victim's detailed description of the defendant's actions against her and her testimony indicating that Darnell Sneeze, Jammie Smith, and Toyomi Johnson all witnessed the incident, the jury also heard Darnell Sneeze testify that the defendant did not have a knife, did not grab S.M. by the hair and/or physically abuse her in any other way on the night in question. The jury also heard Darnell Sneeze state that he did not call Iris Smith to Kimber's house. The jury was privy to the testimony of both Jammie and Toyomi, wherein the girls indicated that the defendant did not have a knife despite having previously stated, and signed written statements indicating, that he did.

As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. Moreover, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Houston*, 98-2658, p. 5 (La.App. 1 Cir. 9/24/99), 754 So.2d

256, 259; *State v. Johnson*, 99-0385, pp. 9-10 (La.App. 1 Cir. 11/5/99), 745 So.2d 217, 223; *State v. Duncan*, 98-1730, p. 18 (La.App. 1 Cir. 6/25/99), 738 So.2d 706, 717 ("A determination of the weight of the evidence is a question of fact, not subject to appellate review."). Thus, a reviewing court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. *State v. Mussall*, 523 So.2d at 1311 ("[T]he reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence."); *State v. Juluke*, 98-0341, p. 4 (La.1/8/99), 725 So.2d 1291, 1293 (per curiam) ("Given this limited purpose [of the *Jackson* review], the *Jackson* standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the factfinder at trial.").

Herein, the victim testified that the defendant placed the knife to her throat and forced her from the kitchen of Kimber's residence to the bathroom, then again from the bathroom to the yard, and from the yard to her own residence. The victim further testified that the defendant continued to hold the knife to her throat and threatened to "blues" her at her residence. It is well settled that the testimony of the victim alone is sufficient to prove the elements of the offense. *State v. Forbes*, 97-1839, p. 5 (La.App. 1 Cir. 6/29/98), 716 So.2d 424, 427. Although defendant argues the victim's testimony was contradicted and impeached by the trial testimony of other witnesses, he fails to acknowledge that the credibility of the other witnesses (Sneeze, Toyomi, and Jammie) was highly questionable. Although these witnesses changed their stories by the time of the trial, Iris Smith specifically testified that Darnell Sneeze contacted her and advised that something was going on at Kimber's residence. Both Iris Smith and Officer Abbott testified that Toyomi and Jammie

> both provided information that led to the defendant's arrest for aggravated kidnapping. The girls even described the weapon used. Considering the unanimous guilty verdict, it is clear that when faced with conflicting accounts of the events, the jury found the victim credible and gave credence to her version of the events. The jury apparently found the other witnesses (including the defendant) to be incredible. These credibility determinations will not be disturbed on appeal.

*State v. Harper*, 970 So.2d at 598-600.

This court has reviewed all of the testimonial evidence presented at trial. As noted by the state appellate court, the jury heard the testimony from Iris Smith that she had called 911 based upon what she learned the defendant had done to the victim after talking with young witnesses, Jammie Smith (Iris' daughter) and Toyomi Johnson (Iris' niece), as well as with witness Darnell Sneeze. The jury also heard from Houma Police Officer Abbott that he had spoken with Jammie and Toyomi . Based upon what they told him, he called for police back-up and set up a perimeter around the trailer where the defendant and the victim were located.[11]  Abbott also explained that, based upon what he learned of the situation from Jammie and Toyomi, he and other members of the Houma Police Department found it necessary to make a forced

---

[11]Neither Iris Smith nor Officer Abbott were allowed to testify specifically as to the *content* of what was said by Jammie, Toyomi or Darnell due to hearsay restrictions.

entry into the trailer where the defendant had taken the victim. Thus, when Jammie Smith, Toyomi Johnson and Darnell Sneeze testified that they had no knowledge of any problems between the defendant, Henry Harper, and the victim on the day of the crime, and often times claimed they did not recall much of anything from that date, the jury apparently found this testimony lacked credibility and rejected it. The corroborating statements, signed by Jammie and Toyomi, as well as the text of the threatening cell phone message sent to the victim by the defendant also bolstered the victim's testimony. Jammie and Toyomi's subsequent recantation of the content of these statements apparently was considered "suspect" by the jury.

Moreover, the victim's testimony at trial was strong, detailed and consistent throughout. Although she initially told the police that the defendant didn't do anything to her, she was in a hysterical state at that time and the jury apparently accepted her claim that it was her fear of the defendant that made her tell the police nothing happened.[12]

After carefully reviewing the evidence, and giving the appropriate deference to the jury's credibility determinations, the court finds that a rational jury,

---

[12]See Testimony of S.M. at State Rec. vol. 2 at pp. 409-410, 429-30; See Testimony of Officer Abbott at State Rec. vol. 2, pp. 442-444.

viewing the evidence in the light most favorable to the prosecution, could have concluded the state proved beyond a reasonable doubt all of the essential elements of simple kidnapping. Thus, the state court's determination that petitioner was not entitled to relief on this claim was not contrary to or an unreasonable application of United States Supreme Court precedent (*Jackson v. Virginia*). The claim of insufficient evidence is without merit.

## Wrongful Admission of Written Statements

Petitioner also complains that the state trial court erred in allowing the written statements of witnesses Jammie Smith and Toyomi Johnson into evidence. Petitioner complains that the "child witnesses did not write the  statements that were introduced at trial." Factually, petitioner is correct.  Both Jammie Smith and Toyomi Johnson testified at trial that they did not write their own statements, which were subsequently provided to the police. However, both girls testified that they did sign the statements that were prepared for them.[13] Petitioner claims that, since the girls were not the ones who prepared their own statements, the admission of the statements violated the Confrontation Clause.

---

[13]State Rec. vol. 2 at p. 368-369, 371-72 (Jammie Smith); State Rec. vol. 2 at p. 381, 383-84 (Toyomi Johnson).

The issue of whether the statements of Jammie Smith and Toyomi Johnson were properly admitted at trial was raised by petitioner's attorney on direct appeal. There, counsel argued, relying on the Louisiana Code of Evidence, articles 607 and article 613,[14] that the written statements should not have been admitted because the State erroneously used the statements for their substance and not for the limited purpose of impeaching the credibility of the witnesses. The state appellate court addressed the issue as follows:

> Initially, we note that contrary to the defendant's assertions in his brief, the record reflects that counsel adequately complied with the foundational mandates of Article 613 as to the written statements in question. Jammie and Toyomi were both questioned extensively regarding what they observed at Kimber's residence on the night in question. Specifically, both girls were asked if the defendant was armed with a knife. Despite having previously signed written statements indicating that the defendant threatened S.M. with a knife to her throat, both girls testified that the defendant did not have a knife. When questioned regarding the written statements, both Jammie and Toyomi testified that they did not actually draft the statements. Instead, they only signed the documents that had been prepared for them after telling family members what happened. Neither child could remember who wrote the statements for them. The State then offered, and was allowed to introduce over

---

[14]La. Code of Evidence article 603 permitted the introduction of a prior inconsistent statement, even though it was inadmissible hearsay, for the limited purpose of attacking the credibility of a witness. La Code of Evidence article 613 set forth the requirements for laying the proper foundation before the admission at trial of a prior inconsistent statement made by a witness.

defendant's objection, both of the written statements into evidence.

Once the foundation was established, evidence of the prior inconsistent statements was admissible to attack the credibility of the witnesses. La.Code Evid. art. 607(D)(2). Each girl's admission to signing the written statement prepared for her (which was clearly inconsistent with her trial testimony) accomplished her impeachment. At this point, since the state had already accomplished the impeachment of the witnesses through their trial testimony, the written documents of the prior inconsistent statements were inadmissible under Article 607. However, under the current version of La.Code Evid. art. 801(D)(1)(a), which is the controlling law in this matter, the statements were not hearsay and thus, they were admissible not only to impeach, but also as substantive proof of the offense.

Prior to its revision by 2004 La. Acts No. 694, § 1, Article 801(D)(1)(a) provided that a prior statement by a witness is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is inconsistent with his testimony, and was given under oath subject to the penalty of perjury at the accused's preliminary examination or the accused's prior trial and the witness was subject to cross-examination by the accused.

Following the 2004 revision, Article 801(D)(1)(a) now provides that a prior statement by a witness is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is, in a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness's attention to the statement and the witness has been given the opportunity to admit the fact and

where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement.

The amended provision, which is substantially broader than its predecessor, renders most prior inconsistent statements admissible in criminal cases provided the proper foundation is established. Thus, while the prior inconsistent statements in this case were admissible to attack credibility under Article 607(D)(2), pursuant to the 2004 revision to Article 801(D)(1)(a), such non-hearsay statements are admissible for their assertive value, as well. See George W. Pugh et al., Handbook on Louisiana Evidence Law 471-472, authors' note no. 9 to Article 607 (2006).

Therefore, contrary to all of the defendant's various assertions in his brief, the admission of the written statements was not error. This assignment of error lacks merit.

*State v. Harper*, 970 So.2d at pp. 601.

Insofar as petitioner challenges the correctness of the state court's evidentiary ruling before this court, it has been uniformly held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). It is well-established that alleged trial court errors in the application of state procedure or evidentiary law, particularly regarding the

admissibility of evidence, are generally not cognizable as grounds for federal habeas relief. *Id.*  A state court's evidentiary ruling only presents a cognizable federal habeas claim if the ruling results in a "denial of fundamental fairness" *See Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).  The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant' s conviction. *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007); *Jackson v. Johnson*, 194 F.3d 641, 656 (5th Cir. 1999), *cert. denied*, 529 U.S. 1027, 120 S.Ct. 1437, 146 L.Ed.2d 326 (2000); *Neal*, 141 F.3d at 214. See also *Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

The state courts have ruled that the written statements were properly admitted under state law and it is not the role of this court to re-visit those issues. However, even if the letters were not properly admitted, this court would not find habeas relief to be warranted.  Assuming, arguendo, that the admission of this evidence was constitutional error, the claim "still falls if the petitioner has not shown that the evidence had a 'substantial and injurious effect or influence in determining the [ ] jury's verdict.'" *Janecka v. Cockrell*, 301 F.3d 316, 328-29 (5ᵗʰ Cir. 2002),

quoting *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In this case, the written witness statements of Jammie Smith and Toyomi Johnson were corroborative of the victim's testimony but the testimony of the victim, alone, was sufficient to sustain the conviction. See *State v. Forbes*, 716 So.2d 424, 427 (La. App. 1 Cir. 1998). Thus the admission of the statements, while helpful to the State to corroborate the victim's story, did not amount to a crucial factor in the conviction of petitioner.

      The court also notes that petitioner's challenge to the written statements before this court relies on the Confrontation Clause. However, petitioner did not argue the constitutional issue implicated by a Confrontation Clause violation when he pursued the issue in the state courts. His claim regarding the improper admission was based upon and decided upon Louisiana evidentiary law rather the Constitution. Thus, although the state conceded exhaustion, the claim relies upon new legal theories not previously exhausted in the state courts. The claim is, therefore, before this court in a technically unexhausted posture. *See Duncan v. Henry*, 513 U.S. 364, 366, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995)(If a habeas petitioner wishes to claim that a state evidentiary ruling denied him due process of law, he must raise the constitutional claim not only before the federal court but also the state court .) Since the State

conceded exhaustion, in an abundance of caution, the court will address the Confrontation Clause argument made by petitioner.

The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides,    "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed.2d 666 (1990); *see also*, *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 1109-10, 39 L. Ed.2d 347 (1974)(Confrontation Clause guarantees criminal defendants the opportunity to cross-examine witnesses against them.)  Petitioner in this case appears to argue that he should have had the right to confront the *author* of the written statements which were signed by Jammie Smith and Toyomi Johnson. Petitioner ignores the fact, however, that regardless of who may have written the statements, Jammie Smith and Toyomi Johnson vouched for the truth of the facts contained in those statements when they signed and adopted the statements as their own.[15] As such, petitioner's rights under the Confrontation Clause would be protected if he had the opportunity to cross-examine the witnesses who signed said statements. Counsel for

---

[15]See Rec. Doc. 1 at pp. 43 & 44 for a copy of the contested witness statements.  Above the signatures of Jammie and Toyomi, it states: "I have read the __ pages of this statement and the facts contained therein are true and correct."

defendant did, in fact, cross-examine Jammie and Toyomi about the circumstances under which they signed the statements as well as about the content of those statements (the content of which they recanted at trial). The jury, however, did not believe their testimony and instead chose to believe the victim in this case. Petitioner was not entitled to cross-examine the unnamed person who wrote the statements that the witnesses signed, thus no Confrontation Clause violation has occurred.

### RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Henry Harper **be DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result

from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[16]


New Orleans, Louisiana, this 10th day of January, 2011.


_____
LOUIS MOORE, JR.
UNITED STATES MAGISTRATE JUDGE

---

[16]*Douglas* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.